IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 18, 2017 Session

## STATE OF TENNESSEE v. SUSAN LYNETTE BAKER

**Appeal from the Circuit Court for Sequatchie County**
**No. 11CR67     Buddy D. Perry, Judge**

---

### No. M2016-00434-CCA-R3-CD

---

The defendant, Susan Lynette Baker, appeals her Sequatchie County Circuit Court jury convictions of felony murder, especially aggravated robbery, and setting fire to personal property, claiming that the trial court erred by refusing to suppress the pretrial statement she provided to the police, the evidence of her theft of property from the victim's residence, and the surveillance video from a motel; that the trial court erred by denying her motion to sever the arson charge from the remaining charges; that the evidence was insufficient to support her convictions of felony murder and especially aggravated robbery; and that "the very nature" of the felony murder statute violates principles of due process. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Samuel F. Hudson, Dunlap, Tennessee, for the defendant, Susan Lynette Baker.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; J. Michael Taylor, District Attorney General; and Steven H. Strain, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

A Sequatchie County Circuit Court jury convicted the defendant of felony murder, especially aggravated robbery, and setting fire to personal property in relation to the death of the victim, Clifford Carden, Jr., as well as the theft of his property and the subsequent attempt to cover up the crime.

On February 3, 2011, Larry Eggert happened upon a body floating in the river in the area of Pickett's Bridge while out looking for cans on East Valley Road in Sequatchie County. Sequatchie County Sheriff's Department ("SCSD") Detective Jody Lockhart responded to the subsequent 9-1-1 call reporting the discovery. He observed blood and drag marks on the river bank. On that same day, SCSD Deputy Danny Hall "[f]ound a burned car that was . . . out in the woods" just north of Dunlap. An accelerant had been used to burn the car completely to its frame. Deputy Hall discovered a handicapped driver placard "to the right side of the passenger door on the outside of the car." The number from the placard led Detective Lockhart to the victim's driver's license photograph, which he then used to identify the victim's body.

An autopsy established that the victim died from a single gunshot wound to the head. "The bullet traveled from right to left, slightly upward and from the back to the front of his head." Stippling around the entrance wound indicated that "the muzzle of the gun was anywhere from approximately two to three inches to two to three feet" away from the victim's head when fired.

After identifying the victim, Detective Lockhart went with the victim's estranged wife, Cindy Carden, to the victim's home, where he observed a propane tank pushed against a wall heater that had been left in the on position. Ms. Carden confirmed to Detective Lockhart that "NASCAR memorabilia and different trinkets" were missing from the home. Ms. Carden found a photograph of the defendant and the victim that had been taken at the beach.

Surveillance video from the Mountain Valley Inn and Suites in Dunlap captured the arrival of the defendant and the co-defendant, Thomas Brian Bettis, just after 5:00 p.m. on February 2, 2011, in the victim's car. The defendant paid three nights' lodging using cash. Surveillance video also captured the defendant carrying NASCAR memorabilia into the motel.

On that same day, the co-defendant went to the Phillips 127 Shell Station near the motel and asked store clerk Stanley Labron Hobbs "for anything to put gas in," and Mr. Hobbs gave him "a blue Maxwell House Coffee jug." Mr. Hobbs saw the co-defendant later that same night and "noticed that his facial hair was singed, and it looked like what appeared to be blood on his blue jeans."

Randy Griffith encountered the defendant and co-defendant walking on Old Union Road on the evening of February 2, 2011. He gave the pair a ride to the Walmart near the Mountain Valley Inn and Suites. Surveillance video from the Walmart captured the pair shopping in the clothing section and then checking out shortly after 7:00 p.m. A receipt obtained from the defendant's purse following her arrest indicated a cash purchase

-2-

in excess of $300.  Items recovered from the dumpster behind the motel included "one bag in particular that had a bunch of Wal-Mart bags in it" as well as "a pill bottle inside it that belonged to our victim and also had blood on it."

Officers learned that the defendant sold a nine millimeter handgun to bar owner Gary Harding in the early part of February 2011.  Tennessee Bureau of Investigation ("TBI") testing established that the bullet recovered from the victim's head during his autopsy was fired by the gun the defendant sold to Mr. Harding.

The defendant was arrested at a residence in Hamilton County on February 8, 2011.  Following her arrest, TBI Agent Mark Wilson advised the defendant of her constitutional rights, and the defendant signed a written waiver of those rights before providing a video recorded statement to Agent Wilson and Detective Lockhart.  The recording was exhibited to Agent Wilson's testimony and played for the jury.  The defendant told them that she had maintained romantic relationships with both the victim and the co-defendant at different points.  During her relationship with the victim, the victim had taken care of the defendant and taken her on a number of trips.  In the days before the victim's murder, the defendant and the co-defendant had a falling out, and the defendant called the victim to pick her up.  The two went to dinner and then out "drinking" before she spent the night at his house.  On the day of the murder, the defendant and the victim met the co-defendant at a store, and the three rode around for a while.  The defendant, who had armed herself with the murder weapon before getting into the car, eventually acknowledged that she and the co-defendant had planned to rob the victim for pills and money.  The defendant claimed that the victim became aggressive with her as they drove along Gulf Road in Cartwright in Sequatchie County and began calling her names.  She said, "I snapped.  I did.  I snapped."  She shot the victim in the side of the head, and the car rolled into a fence.  Detective Lockhart traveled to the area described by the defendant and found "an area that was consistent with a vehicle running off the road, and it was consistent with a small farm fence post and a small sapling tree that had been hit."

After the defendant shot the victim, she and the co-defendant moved the victim's body into the passenger's seat, and the defendant drove the car to the river.  The defendant demonstrated for Agent Wilson and Detective Lockhart how she parked the vehicle before she and the co-defendant dragged the victim's body into the river.  She said that she took just over $1,000 from the victim before they discarded his body.  They then drove the victim's car to his residence, where they used the victim's keys to enter the home and steal NASCAR memorabilia.  They then drove to the Mountain Valley Inn and Suites.  She said that the co-defendant obtained the gasoline and directed her as she drove the car to a remote area so that they could burn it.  The defendant admitted that they took the victim's pills and that she sold the murder weapon.

The defendant's father and son testified that she had become addicted to prescription medication and that she was addicted to that medication at the time of the murder. Doctor Robert Brown, a neuropsychologist who treated the defendant, testified that the defendant had been treated for mental illness throughout her life and that she suffered from "neuro-cognitive deficits and would have qualified for special education services." Doctor Brown testified that the defendant's neurobehavioral problems caused her to become a "yea sayer" so that she could "pretend that she is normal . . . because she doesn't know to handle things."

Based upon this evidence, the jury convicted the defendant as charged. The trial court imposed a sentence of life imprisonment for the defendant's conviction of murder and, following a sentencing hearing, imposed respective sentences of 15 years and 2 years for the defendant's convictions of especially aggravated robbery and setting fire to personal property. The court ordered all of the sentences to be served concurrently.

Following the denial of her timely motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant challenges the trial court's rulings denying her motions to suppress the statement she made to Agent Wilson and Detective Lockhart, the evidence that she stole items from the victim's residence following the murder, and the surveillance video from the Mountain Valley Inn and Suites. The defendant also challenges the trial court's denial of her motion to sever the charge of setting fire to personal property from the charges of felony murder and especially aggravated kidnapping. Additionally, the defendant contends that the evidence was insufficient to support her convictions of felony murder and especially aggravated robbery and that Code section 39-13-202 violates principles of due process because it contains no mens rea requirement for felony murder. We consider each claim in turn.

### I. Motions to Suppress

#### A. Defendant's Statement to Agent Wilson and Detective Lockhart

The defendant asserts that the trial court erred by refusing to suppress the video recorded statement she gave to Agent Wilson and Detective Lockhart following her February 8, 2011 arrest, claiming that she did not voluntarily, knowingly, and intelligently waive her constitutional right to remain silent and that the statement was not voluntarily given. Specifically, she contends that her neurocognitive deficits as described by Doctor Brown as well as her voluntary intoxication on prescription medication prevented her from fully understanding her right to remain silent or appreciate the consequences of making a statement to the police. She also argues that her

-4-

neurocognitive deficits caused her to go along with the "forceful questioning" of the officers.

At the hearing on the defendant's motion to suppress her statement, Agent Wilson testified that he provided *Miranda* warnings to the defendant immediately following her arrest. He said that the defendant did not ask for an attorney at that or any other time following her arrest. Sequatchie County Sheriff Ronnie Hitchcock and his wife, Linda Hitchcock, who worked as a reserve deputy with the SCSD, transported the defendant to the jail, where she waited in an interview room with Ms. Hitchcock until Agent Wilson and Detective Lockhart arrived. Agent Wilson provided *Miranda* warnings to the defendant for a second time and went over the written rights waiver with her. He recalled that the defendant asked questions about the form before signing it. The defendant specifically asked for confirmation that she did not have to talk to detectives and that she could ask for an attorney at any time during her questioning. She also asked if it would be held against her if she started answering questions and then asked to stop and whether she had to sign the rights waiver. Agent Wilson said that he initially read the form to the defendant and that she asked if she could read it herself. The defendant eventually signed the form.

Agent Wilson said that the defendant "explained things very specifically" when asked to relate the circumstances of the crime and that she provided details that could only have been known to the killer. He confirmed that the defendant appeared lucid at all times during the interview and that she did not appear to be under the influence of narcotics. He said that she "appeared to be of sound mind to" him. During the interview, the defendant moved around to demonstrate how she shot the victim, and he did not notice anything unusual in her gait as she did so. The defendant was not rambling or incoherent. She gave an approximate timeline of events and recalled the exact amount of money they had taken from the victim. The video recording of the defendant's statement was admitted into evidence and reviewed by the trial court.

During cross-examination, Agent Wilson maintained that he did not believe the defendant was impaired during the interview, and he could not say why the booking sheet listed the defendant as under the influence. He said that he did not consider waiting overnight to question the defendant. He acknowledged that the defendant initially insisted that the co-defendant had killed the victim but later admitted that she had shot him. Agent Wilson insisted that the defendant's initial deflection suggested to him that "[s]he was competent enough to be deceitful and lie about what had happened." Agent Wilson conceded that despite his having shown the defendant his badge and having identified himself as a TBI agent at the beginning of the interview, the defendant asked if he was a lawyer at the end of the interview. The defendant told him that she did not

remember seeing his badge but did remember seeing him. She then asked, "'Now, when am I suppose[d] to have a lawyer?'"

Detective Lockhart testified that, based upon his training and experience, he did not believe the defendant to be under the influence of drugs or alcohol at the time of her arrest. He said that he had no prior knowledge of the defendant's history of drug abuse. Detective Lockhart said that he did not find the defendant's behavior unusual and found that she spoke coherently throughout the interview. During cross-examination, he denied that the defendant's demeanor was slow or subdued.

Ashley Hickey, who shared a cell with the defendant for approximately three weeks while the two women were incarcerated in Sequatchie County, testified that the defendant had revealed to her the details surrounding the victim's murder as well as the defendant's plan to avoid being found competent to stand trial. Ms. Hickey said, "She'd have tantrums, her moods would vary depending on officers coming in or out. There was one point where she went to Erlanger due to her kidneys where she had cut herself to where there was blood in her urine."

Ms. Hickey acknowledged having previously pleaded guilty to filing a false police report. She also admitted that, following the murder, she and her boyfriend, Doyle Hatfield, who was a friend of the co-defendant's, stayed at the Mountain Valley Inn and Suites across the hall from the defendant and co-defendant. She denied knowing the co-defendant "personally"; having tried to purchase pain pills from the co-defendant; having sent text messages to the co-defendant's sister offering to "help him"; and having told the defendant that the co-defendant came to the room she shared with her boyfriend with a rose in his mouth.

The defendant's father, Raymond White, testified that the defendant began taking pain medication for kidney stones when she was 10 years old and that she eventually became addicted to the medication and began abusing it. He said that her abuse of the medication affected her memory. After the defendant's arrest, Mr. White spoke with Sheriff Hitchcock, who told him that the defendant "was in bad shape, she was asleep, and they w[ere] going to take her over there and get her in bed and assured me that she would have a lawyer present in her condition." The sheriff emphasized to Mr. White that the defendant was "[s]toned." Mr. White acknowledged that he did not see the defendant on the day she was arrested.

SCSD Corrections Officer Stacy Slaven testified that she assisted in the process of booking the defendant into the jail following her interview. She acknowledged having steadied the defendant to obtain her fingerprints and photograph. She said that the defendant "was falling asleep." Officer Slaven was aware that the

defendant's booking sheet reflected that the defendant appeared to be under the influence of drugs at the time of her booking. Upon questioning by the court, she described the defendant as "tired, very tired."

Deputy Chief Clint Walker, the jail administrator, was not present during the defendant's booking but saw her on the following morning. He said that the defendant was held for the first few days "in a medical cell there in the front so that [jailers] could maintain close observation" because he was initially concerned that the defendant "may be really really distraught about her charges and might want to harm herself or something like that," saying that it was his practice to give defendants charged with such serious crimes "a few days to settle down" before they are placed in the general population. He acknowledged that the defendant slept "[p]retty much around the clock for three days" despite being held in a location where the lights were on 24 hours a day and there was "constant traffic day and night, doors slamming, people talking, stuff going on." He said that the defendant did not display "any signs of withdrawal" from drugs and instead "just slept."

Doctor Brown testified that he began treating the defendant after the murder at the request of her primary care physician, who had diagnosed the defendant with "schizo [a]ffective disorder, bipolar type with psychotic features." Doctor Brown said that he did not observe "the level of schizophrenia that would match that diagnosis." Instead, his testing showed that the defendant was experiencing neurocognitive deficits, including difficulties with executive function such as working memory, that Doctor Brown believed to be caused by a brain malformation. Doctor Brown testified that he had watched the video recording of the defendant's interview with Agent Wilson and Detective Lockhart and that he had observed "differences in her performance during the interrogation" that he had "never seen at any other time." He said that he observed "labilia," which he described as an inability of the defendant to manage her emotions, and "disinhibition," which he described as "the freedom to disclose and be uninhibited," both of which were out of character for the defendant. He also noticed "some possible slurred speech." Doctor Brown said that his "very first impression" was that the defendant was under "some influence . . . from some kind of psychoactive substance."

Doctor Brown testified that, at the request of the defendant's attorney, he used two "instruments" to assess the defendant's "Miranda capabilities," and found that "she had considerable difficulty in all eight examination sessions using either one of those instruments." Upon questioning by the court, Doctor Brown admitted that nothing in the defendant's demeanor as displayed on the video recording would have led Agent Wilson or Detective Lockhart to believe that the defendant did not comprehend and voluntarily waive her rights, saying, "[T]hey had nothing that they could have seen or perceived that would have said she lacks the capacity to appreciate what she has signed

here, which is waiving her Miranda Rights, the written statement, that she has read and signed, and their explanation to her."

Doctor Brown opined that, because of her personality, the defendant would tend to "acquiesce and do what pleases [the police] and not upset them, reduce any frustration." He conceded, however, that he did not "pick that [tendency] up so strongly" when watching the interrogation video. Doctor Brown said the defendant would allow the officers to "take the lead and run the show and she will fit whatever . . . she thinks they want to hear." Doctor Brown insisted that the defendant was not malingering and instead had poor working memory. He testified that, had he been in the interview room, he would not have identified the defendant's issues with competency because he did not "realize there's these impairments" until he had performed a litany of tests. Upon questioning by the court, Doctor Brown confirmed the voluntariness of the defendant's statement, saying, "She voluntarily made the statements, yes, Your Honor." He added, however, that the defendant "doesn't comprehend the implications of then cooperating with law enforcement in the interrogation."

During cross-examination, Doctor Brown agreed that he saw no indication that the defendant was so impaired that she did not know what she was doing when she waived her rights and provided the statement in this case. He agreed that nothing would have indicated to either officer that the defendant lacked the mental capacity to waive her rights and provide a statement, noting that the defendant's mental issue is "[s]o subtle that [he] missed [it] with nine months of psychotherapy" even though "the psychological tests" showed "some real serious problems." He added that he also "[d]idn't get it out of the video seeing it five times . . . blown . . . up on a 60-inch screen" with "an equalizer to modify the audio."

At the conclusion of the hearing, the trial court denied the defendant's motion to suppress, ruling,

> [I]f you take a totality of circumstances standard and apply that, the fundamental issue . . . is the power of the state being used fairly when attempting to get information from a defendant, and to put an officer in a position to have to become some sort of mental health evaluator in order to make that decision, I think is really above my pay grade level. I think this [is] an admissible statement. I'm going to rule that it's admissible . . . .

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215,

-8-

217 (Tenn.2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (holding "the Fifth Amendment's exception from compulsory self-incrimination" applicable to the states through the Fourteenth Amendment). This means that, to pass federal constitutional muster and be admissible at trial, a confession must be free and voluntary and not "'extracted by any sort of threats or violence, nor obtained by any direct or implied promises, . . . nor by the exertion of any improper influence'" or police overreaching. *Bram v. United States*, 168 U.S. 532, 542-43 (1897) (citation omitted). The rule is equally applicable to confessions given during custodial interrogations following appropriate provision of *Miranda* warnings, *see State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980), and those provided before the defendant has been placed in custody, *see Arizona v. Fulminante*, 499 U.S. 279, 286-88 (1991). To determine voluntariness, the reviewing court must examine the totality of the circumstances surrounding the confession to determine "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determine–a question to be answered with complete disregard of whether or not [the defendant] in fact spoke the truth." *Rogers v. Richmond*, 365 U.S. 534, 544 (1961).

Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. "The test of voluntariness for confessions under Article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (citing *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994)); *see also State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005). "The critical question is 'whether the behavior of the state's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined.'" *Smith*, 933 S.W.2d at 455-56 (quoting Kelly, 603 S.W.2d at 728 (internal citation and quotation marks omitted)). Moreover, because of the extra protection afforded by the state constitution, "[f]or the relinquishment of rights to be effective, the defendant must have personal awareness of both the nature of the right and the

consequences of abandoning his rights." *Thacker*, 164 S.W.3d at 249 (citing *Stephenson*, 878 S.W.2d at 544–45). Accordingly, "the totality of the circumstances must reveal 'an uncoerced choice and the required level of comprehension before a court can properly conclude that *Miranda* rights have been waived.'" *State v. Blackstock*, 19 S.W.3d 200, 208 (Tenn. 2000) (quoting *Stephenson*, 878 S.W.2d at 545; *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

An accused "may knowingly and intelligently waive the right against self-incrimination only after being apprised of" the constitutional rights to remain silent and to counsel during interrogation. *Thacker*, 164 S.W.3d at 248. As with the voluntariness of a statement, the trial court "may conclude that a defendant voluntarily waived his rights if, under the totality of the circumstances, the court determines that the waiver was uncoerced and that the defendant understood the consequences of waiver." *Id.* (citing *Stephenson*, 878 S.W.2d at 545).

> When the voluntariness of a statement given to police is challenged based on the defendant's competency to waive the rights provided by *Miranda*, the determinative issue is "whether the defendant had the capacity in the first place to form a will of his own and to reject the will of others."

*Thacker*, 164 S.W.3d at 249 (quoting *State v. Benton*, 759 S.W.2d 427, 431 (Tenn. Crim. App. 1988)). "Among the circumstances courts have considered are the defendant's age, background, level of functioning, reading and writing skills, prior experience with the criminal justice system, demeanor, responsiveness to questioning, possible malingering, and the manner, detail, and language in which the Miranda rights are explained." *Blackstock*, 19 S.W.3d at 208. Importantly, "mental impairments" are simply "factors that must be considered along with the totality of the circumstances," and "'no single factor, such as IQ, is necessarily determinative in deciding whether a person was capable of knowingly and intelligently waiving'" constitutional protections. *Id.* (quoting *Fairchild v. Lockhart*, 744 F. Supp. 1429, 1453 (E.D. Ark. 1989)).

In our view, the trial court did not err by denying the motion to suppress in this case. Although Doctor Brown testified that the defendant suffered from neurocognitive deficits that prevented her from fully comprehending the consequences of waiving her constitutional rights to cooperate with the police, he agreed that she voluntarily waived those rights and voluntarily provided the statement in this case. She was twice provided with *Miranda* warnings and nevertheless agreed to waive them, once in writing. Having reviewed the video recording of the defendant's statement, we agree with the court and with Doctor Brown that nothing in the recording suggests that the defendant was incapable of voluntarily waiving her rights and providing a statement in

-10-

this case. Before signing the written waiver of her rights, the defendant, who had obtained a GED, asked the officers questions about the form. Despite the defendant's claim to the contrary, the video does not evince that she was "severely impaired and/or intoxicated" during the interview. The defendant appears lucid and coherent throughout her interaction with the officers. Although she initially claimed that the co-defendant shot the victim, she later admitted that she had done so, providing a detailed explanation and a physical demonstration of how the shooting occurred. The defendant assisted the officers in creating a diagram of the location where the victim's body was dumped. No evidence suggests that the officers coerced the defendant. In sum, the totality of the circumstances supports the trial court's conclusion that the defendant possessed the capacity to voluntarily and knowingly waive her constitutional rights and provide a statement in this case.

## B. Evidence of Theft from Victim's Residence

The defendant contends that the trial court erred by refusing to exclude evidence that she and the co-defendant took items from the victim's residence following his murder. The State asserts that the trial court did not err.

Prior to trial, the defendant moved the trial court to exclude this evidence, arguing that it was irrelevant or, in the alternative, unfairly prejudicial. As the State correctly points out, the trial court's ruling with regard to this motion does not appear to be included in the record on appeal. At the hearing on the motion for new trial, the trial court simply indicated that it had considered and ruled on the motion prior to trial and that it would stand by its earlier ruling. The record, however, does not indicate that the defendant ever actually argued her motion or that the trial court ever actually ruled on it. Additionally, the single reference to the record provided in the defendant's brief is not to the court's ruling on her motion. Under these circumstances, the defendant has waived plenary consideration of this issue. *See* Tenn. R. App. P. 27(a)(7) (stating that the appellant's brief must contain an argument "setting forth . . . the contentions of the appellant with respect to the issues presented, and the reasons therefor . . . with citations to the authorities . . . relied on"); Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

## C. Video Surveillance from Mountain Valley Inn and Suites

The defendant asserts that the trial court erred by admitting into evidence video surveillance from the Mountain Valley Inn and Suites, arguing that "the increased speed of the recording was highly prejudicial" to the defendant because it prevented the

jury from observing any evidence of the defendant's alleged impairment. The State contends that the trial court did not err by admitting the video surveillance.

Prior to trial, the defendant moved the trial court to exclude the video surveillance because it would only play at a higher than normal rate of speed. The court's ruling does not appear in the record. During trial, the defendant again objected to the video, and the court overruled the objection, noting a "conversation in chambers this morning regarding the video." The trial court did, however, provide the following instruction to the jury regarding the video:

> Ladies and gentlemen, I want to make sure that you understand something. The speed of the videos is not real time. It is faster than real time and so we don't want to . . . present any confusion that people are moving faster . . . it's the video itself that's doing that.

Questions concerning evidentiary relevance rest within the sound discretion of the trial court, and this court will not interfere with the exercise of this discretion in the absence of a clear abuse appearing on the face of the record. *See State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)).

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence which is not relevant is not admissible," Tenn. R. Evid. 402, and even if evidence is deemed relevant, it may be still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," Tenn. R. Evid. 403.

Here, the surveillance video showed the defendant and co-defendant arriving at the motel driving the victim's vehicle and carrying items taken from the victim's home into the motel. The video also showed the defendant paying for their room with cash ostensibly taken from the victim. In consequence, the surveillance video was certainly relevant to the charged offenses. Although the video played at greater-than-normal speed, the trial court's instruction cured any possible prejudice from the speed of

the video.

## II. Severance

The defendant asserts that the trial court erred by refusing to sever the charge of setting fire to personal property from the charges of felony murder and especially aggravated robbery. She contends that because that charge was far less serious than the other two charges and because most of the evidence regarding the burning of the victim's car indicated that the co-defendant was responsible for the burning, severance of the offense was necessary "to ensure that [the defendant] was not unfairly judged for the more serious offenses based upon her limited involvement in an act that was an afterthought of more egregious behavior." The defendant provides no authority for her assertion.

We review the propriety of a trial court's decision regarding the consolidation of indictments or severance of charges for abuse of discretion. *See State v. Garrett*, 331 S.W.3d 392, 401 (Tenn. 2011) (citing *Spicer v. State*, 12 S.W.3d 438, 442 (Tenn. 2000)); *see also State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *Garrett*, 331 S.W.3d at 401 (citing *State v. Jordan*, 325 S.W.3d 1, 39 (Tenn. 2010)).

"Before a trial court may deny a severance request, it must hold a hearing." *State v. Dotson*, 254 S.W.3d 378, 387 (Tenn. 2008). Because the determination whether multiple offenses should be joined or separated for trial establishes a format for trial, the issue obviously must be presented and resolved before trial. *See Garrett*, 331 S.W.3d at 403; *see also* Tenn. R. Crim. P. 13(b) (providing that a trial court may order severance of offenses before trial); Tenn. R. Crim. P. 14(a)(1)(A) (providing that a defendant, except in the event of a later arising ground, shall move to sever offenses "before trial"). The trial court must base its decision regarding severance on "the evidence and arguments presented at the hearing," and, as a result, our review on appeal is limited "to that evidence, along with the trial court's findings of fact and conclusions of law." *Spicer*, 12 S.W.3d at 445; *see also Garrett*, 331 S.W.3d at 404 (where supreme court conducted its "analysis on the basis of the evidence adduced at [the d]efendant's trial instead of only the evidence adduced at the hearing" because trial court failed to hold a pretrial hearing).

At the hearing on the defendant's motion to sever the offenses, neither party presented any proof. The State argued that joinder of the offenses was mandatory, and the trial court agreed.

-13-

Here, all the offenses were charged in a single indictment. Tennessee Rule of Criminal Procedure 8 governs both mandatory and permissive joinder of offenses. Pursuant to that rule, offenses must be joined if they are:

(A) based on the same conduct or arise from the same criminal episode;
(B) within the jurisdiction of a single court; and
(C) known to the appropriate prosecuting official at the time of the return of the indictment(s), presentment(s), or information(s).

Tenn. R. Crim. P. 8(a). Offenses may be joined for trial if "(1) the offenses constitute parts of a common scheme or plan; or (2) they are of the same or similar character." Tenn. R. Crim. P. 8(b). Regardless whether the joinder of offenses was mandatory or permissive in any given case, the defendant may file for a severance of offenses pursuant to Tennessee Rule of Criminal Procedure 14. In cases of mandatory joinder, when the defendant asks for a severance prior to trial, "the court shall grant a severance of offenses . . . when the court finds a severance appropriate to promote a fair determination of the defendant's guilt or innocence of each offense." Tenn. R. Crim. P. 14(b)(2). In cases of permissive joinder, "the defendant has the right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others." Tenn. R. Crim. P. 14(b)(1).

In her brief, the defendant concedes that joinder of the offenses in this case was mandatory but argues that severance was necessary "to promote a fair determination of the defendant's guilt." We disagree. Evidence that the defendant and co-defendant burned the victim's car was relevant and admissible as evidence of their attempt to cover up the earlier murder and robbery. That there was evidence to suggest the co-defendant bore the bulk of responsibility for the burning offense avails the defendant no relief because she was clearly criminally responsible for the co-defendant's conduct. *See* T.C.A. § 39-11-402(a)(2) ("A person is criminally responsible for an offense committed by the conduct of another, if . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]").

### III. Sufficiency

The defendant asserts that the evidence was insufficient to support her conviction of felony murder because the State failed to establish that she murdered the victim during the perpetration of the robbery. She claims that the evidence was insufficient to support her conviction of especially aggravated robbery because the State

-14-

failed to establish that the robbery of the victim was accomplished by violence or by the use of a deadly weapon. The State contends that the evidence was sufficient.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

### A. Aggravated Robbery

"Especially aggravated robbery is robbery as defined in § 39-13-401 . . . [a]ccomplished with a deadly weapon; and . . . [w]here the victim suffers serious bodily injury." T.C.A. § 39-13-403. "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39-14-103(a). A deadly weapon is defined as "[a] firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury; or [a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 39-11-106(a)(5).

The defendant argues that because the victim was dead before she took his money and his car, the robbery could not have been accomplished by violence or by the use of a deadly weapon. Essentially, she claims that one cannot rob a dead man. The evidence examined in the light most favorable to the State, however, established that the defendant and co-defendant planned to rob the victim of money and drugs and that the defendant had armed herself to facilitate the robbery. At some point, their plans went awry, and the defendant shot the victim before taking his money. This evidence was

-15-

sufficient to support the defendant's conviction of aggravated robbery.

## B. Felony Murder

The defendant argues that the State failed to establish that she formed the intent to rob the victim prior to or concurrent with the killing of the victim.

As charged in this case, felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." T.C.A. § 39-13-202(a)(2). "The culpable mental state required for conviction is the intent to commit the underlying felony, in this case, robbery or attempted robbery, not the intent to commit murder." *State v. Wagner*, 382 S.W.3d 289, 299 (Tenn. 2012) (citing T.C.A. § 39-13-202(b)). "A killing that precedes, coincides with, or follows the commission of an underlying felony will be considered 'in the perpetration of' the underlying felony, so long as there is a connection in time, place, and continuity of action." *Wagner*, 382 S.W.3d at 299 (citing *State v. Pierce*, 23 S.W.3d 289, 294-97 (Tenn. 2000); *State v. Buggs*, 995 S.W.2d 102, 106 (Tenn. 1999)). "[W]hether a defendant intended to commit the underlying felony, and at what point the intent existed, is a question of fact to be decided by the jury after consideration of all the facts and circumstances." *Wagner*, 382 S.W.3d at 300 (citing *Buggs*, 995 S.W.2d at 107). When determining whether a killing falls within the felony murder rule, the courts of this state "have noted that consideration of such factors as time, place, and causation is helpful." *State v. Patrick Wingate*, No. M1999-00624-CCA-R3-CD, slip op. at 9 (Tenn. Crim. App., Nashville, May 25, 2000) (citing *State v. Lee*, 969 S.W.2d 414, 416 (Tenn. Crim. App. 1997) (holding that when victim was killed in a collision that followed a high-speed chase as defendant fled from the scene of a robbery, the homicide occurred in the furtherance of the robbery because flight from the scene of a crime is an integral part of the crime); *State v. Brown*, 756 S.W.2d 700, 702-03 (Tenn. Crim. App. 1988) (holding that the fact that robbery was complete before the victim was killed did not make the murder "collateral" to the robbery where defendant picked up the victim with the intent of robbing him and killed him to prevent identification)); *see also Pierce*, 23 S.W.3d at 294-95.

In the light most favorable to the State, the evidence established that the defendant and co-defendant planned to rob the victim of drugs and money. Although the defendant, in her pretrial statement, couched their plans to rob the victim in terms of what she hypothetically might have done, the evidence established that the defendant knew the victim often carried prescription pills and large amounts of cash on his person and that she armed herself prior to getting into the car with the victim and the co-defendant. She acknowledged taking the victim's cash immediately after killing him, and the jury was free to disregard her claim that doing so was merely an afterthought. Under these circumstances, the evidence was sufficient to support the defendant's conviction of

-16-

felony murder.

Finally, in a related issue, the defendant argues that the felony murder statute violates principles of due process because it does not require an intent to kill. As the defendant concedes, however, even if we were inclined to agree with her challenge, this court is bound by the rulings of our supreme court that have rejected this precise challenge. *See, e.g., State v. Godsey*, 60 S.W.3d 759, 773 (Tenn. 2001) (declaring Godsey's "claim that the statute violates due process by failing to include a culpable mental state" to be "without merit").

*Conclusion*

Based upon the foregoing analysis, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE